UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

SHANE THIBODEAUX AND HEATHER                                CIVIL ACTION
THIBODEAUX, BOTH INDIVIDUALLY AND
ON BEHALF OF THEIR MINOR CHILDREN,
AUBRE THIBODEAUX, SHANE THIBODEAUX, JR.,
AND AMIEE THIBODEAUX

VERSUS                                                       18-651-SDD-RLB

DISA GLOBAL SOLUTIONS,
INC., ET. AL.

**RULING**

The matter before the Court is the *Motion for Summary Judgment*[1] by Defendant DISA Global Solutions, Inc. ("DISA"). Plaintiffs Shane Thibodeaux ("Thibodeaux") and Heather Thibodeaux both individually and on behalf of their minor children Aubre Thibodeaux, Shane Thibodeaux, Jr., and Amiee Thibodeaux (collectively "Plaintiffs") filed an *Opposition*[2] to this motion to which the DISA filed a *Reply*.[3] For the following reasons, the Court finds that the DISA's *Motion*[4] should be GRANTED.

**I.  BACKGROUND**

    **A. Facts**

    B. This diversity case involves damages allegedly caused by a positive workplace drug test. Plaintiff Shane Thibodeaux ("Thibodeaux") submitted a hair sample that tested positive for methamphetamine—a result he claims was attributable

---

[1] Rec. Doc. No. 28.
[2] Rec. Doc. No. 29.
[3] Rec. Doc. No. 35.
[4] Rec. Doc. No. 28.

to DISA's negligence.[5] Thibodeaux allegedly suffered negative employment consequences when his employer, Troy Rembert, CEO of Specialty Welding and Turnarounds ("SWAT"), was made aware of the results. At issue is whether DISA, which administers the drug testing program at issue, can be held liable for its allegedly negligent acts and those of other third parties in the drug testing chain.

C. DISA developed a policy known as the DISA Contractors Consortium Hair Testing Policy ("DCCHT").[6] The DCCHT provides a standardized substance abuse policy for all "Participating Owners"[7] so that when contractors and their employees move from job site to job site, the contractors do not need to re-test their employees in order to conform to the new Owner's substance abuse policy.[8] Contractors, such as Thibodeaux's employer SWAT, enter into agreements with DISA whereby DISA administers the contractor's substance abuse policy in accordance with the DCCHT.[9] Employees of those contractors, such as Thibodeaux, sign DISA's Universal Membership Application Form, consenting to testing and disclosure of their drug tests to contractors and participating owners.[10] While DISA may not require employees to submit to drug testing, their employers or the participating owners' insistence on adherence to the DCCHT may compel the employee to do so.

---

[5] Rec. Doc. No. 29.
[6] Rec. Doc. No. 29-3, p. 9.
[7] Defined within the DCCHT as "[A]n Owner registered with DISA for verification access, who has accepted the DCCHT Substance Abuse Policy as meeting the requirements of their individual site drug policies." *Id.* at p. 25.
[8] *Id.* at p. 9.
[9] Rec. Doc. No. 29-3, p. 2–3, ¶ 18.
[10] Rec. Doc. No. 28-2, p. 2; Rec Doc. No. 29-2, p. 1.

D. If an employee tests positive for illicit substances, that employee is noncompliant with the DCCHT.[11] Noncompliance with the DCCHT is punished with the classification "Inactive" in DISA's system, which gives contractors and participating owners the right to deny the "Inactive" employee access to a job site.[12] "Inactive" status thus carries negative employment consequences. DISA will return an employee to "Active" status after completion of DISA's "Return-to-Duty Process."[13] However, prior "Inactive" status can preclude employment at "zero tolerance" worksites, as it allegedly did for Thibodeaux.[14]

E. A thorough understanding of the drug testing process is necessary. The first step in the testing process is the collection of the donor's sample.[15] In this case, Gulf Coast Occupational Medicine ("Gulf Coast") collected Thibodeaux's hair sample.[16] After collecting the sample, the collector places it in a sealed container and sends it to a laboratory for drug testing.[17] In this case, Gulf Coast collected the sample and sent it to Psychemedics Laboratory ("Psychemedics").[18] If the laboratory determines that the sample is positive for illicit substances, the results are sent to a Medical Review Officer ("MRO") who reviews the results; and, if necessary, conducts an interview with the donor to determine if the positive result could have a legitimate explanation.[19] In this

---

[11] Rec. Doc. No. 28-2, p. 2–3; Rec Doc. No. 29-2, p. 1.
[12] Rec. Doc. No. 29-3, p. 10.
[13] *Id.* at pp. 27–30.
[14] Rec. Doc. No. 29-5, p. 31; Rec. Doc. No. 29-3, p. 4.
[15] Rec. Doc. No. 28-2, p. 5; Rec Doc. No. 29-2, p. 2–3.
[16] Rec. Doc. No. 28-2, p. 3; Rec. Doc. No. 29-2, p. 2–3.
[17] Rec. Doc. No. 28-2, p. 3; Rec. Doc. No. 29-2, p. 2.
[18] Rec. Doc. No. 28-2, p. 6; Rec. Doc. No. 29-2, p. 3.
[19] Rec. Doc. No. 28-2, p. 3; Rec. Doc. No. 29-2, p. 2.

case, Psychemedics concluded that Thibodeaux's sample was positive for methamphetamine and amphetamine and sent the results to University Services ("University"), the MRO provider.[20] Dr. Harvey Forman, a certified MRO and contractor for University, reviewed Thibodeaux's prescription history, which included a prescription for Adderall, an amphetamine.[21] Dr. Forman interviewed Thibodeaux and concluded that there was no legitimate explanation for the positive methamphetamine results; Thibodeaux contends that over-the-counter sinus and allergy medications could have caused the result.[22] In any event, when the MRO determines that there is no legitimate explanation for a positive result, the MRO confirms the result and reports its conclusion to DISA; Dr. Forman did so in this case.[23] Upon receipt of a positive report, DISA changed Thibodeaux's status to "Inactive" in its database, which resulted in negative employment consequences.[24]

F. Pursuant to the DCCHT, Thibodeaux requested that Psychemedics perform another test on the remaining hair sample.[25] Psychemedics performed an additional test, and sent a portion of the remaining hair sample to Omega Laboratories who also performed another test.[26] Each of these tests were also positive for methamphetamine, although Thibodeaux contends that the results were consistent with the use of over-the-counter allergy and sinus inhalers.[27]

---

[20] Rec. Doc. No. 28-2, p. 6; Rec Doc. No. 29-2, p. 3.
[21] Rec. Doc. No. 28-2, p. 6; Rec Doc. No. 29-2, p. 3.
[22] Rec. Doc. No. 28-2, p. 6; Rec Doc. No. 29-2, p. 3.
[23] Rec. Doc. No. 28-2, p. 4, 7; Rec Doc. No. 29-2, p. 2–3.
[24] Rec. Doc. No. 29-5, p. 31; Rec. Doc. No. 29-3, p. 4.
[25] Rec. Doc. No. 28-2, p. 7; Rec Doc. No. 29-2, p. 3.
[26] Rec. Doc. No. 28-2, p. 7; Rec Doc. No. 29-2, p. 3.
[27] Rec. Doc. No. 28-2, p. 7; Rec Doc. No. 29-2, p. 4.

    Thibodeaux claims that he had taken: Sudafed, Adderall, Flonase, Androgel, and Flexeril and that these drugs could have caused his positive result.[28]

G. The Parties' Arguments

H. Plaintiffs argue that summary judgment is inappropriate because genuine issues of material fact remain as to their claims for DISA's negligence in the drug testing process and loss of consortium. Thibodeaux asserts that several sources demonstrate DISA's alleged duty to "ensure that its procedures are adequate to ensure that a Louisiana worker's drug test is accurate"[29]:(1) Troy Rembert's affidavit and the Master Services Agreement ("MSA") executed by DISA and SWAT; (2) the DCCHT, due to the degree of control asserted over the testing process; (3) "applicable state and federal law," specifically the Louisiana Drug Testing Statute ("LDTS"); and (4) Plaintiffs medical experts' reports.[30]

I. Thibodeaux argues that DISA breached that duty by: (1) not requesting or requiring testing for d/l isomers[31]; (2) not following state and federal laws, specifically the LDTS; (3) and not training or requiring the MRO to request d/l isomer testing for reports with positive methamphetamine results.[32]

---

[28] Rec. Doc. No. 28-19, p. 1, University Services Medical Review Officer Worksheet by Randy Barnett; Rec. Doc. No. 28-12, p.1, University Services Medical Review Officers Worksheet by Dr. Forman.
[29] Rec. Doc. No. 29, p. 10.
[30] Rec. Doc. No. 29, pp. 5–10.
[31] Put simply, methamphetamine comes in two varieties, d-methamphetamine, which is illegal, and l-methamphetamine, which is legal. Testing for d/l isomers determines whether the methamphetamine molecules in the hair sample are d-methamphetamine or l-methamphetamine, and thus illicit or permissible, respectively. Rec. Doc. No. 28-23, p. 6; Rec. doc. No. 28-24, pp. 7–8; Rec. Doc. No. 28-25, p. 6.
[32] Rec. Doc. No. 29, pp. 11–13.

J. As to causation, Plaintiffs conflate the two prongs but argue that each of the above breaches caused Thibodeaux to lose work opportunities because the positive test had a legitimate medical explanation (over-the-counter and prescription drugs) that DISA and University did not consider, and that DISA should have required or trained University to consider.[33] Thibodeaux also argues that a slew of DISA's alleged other breaches caused him damages: failing to properly verify test results, failing to identify and consider the legally prescribed and over-the-counter medications, failing to ensure the quality and integrity of the report received, improper submission of the test results as positive in the DISA database, and failing to take steps necessary to protect Thibodeaux's reputation.[34]

K. DISA argues that summary judgment is merited because there are no disputed facts surrounding DISA's lack of a duty, *inter alia*. According to DISA, Plaintiffs cannot establish the duty element because "DISA did not undertake to perform the analysis or medical review of Mr. Thibodeaux's sample."[35] As such, DISA continues, the failure to test for d/l isomers lies with Psychmedics and University—not DISA.[36] DISA also claims that the DCCHT does not create a duty to ensure the accuracy of the analysis and review process because it "only describes DISA's program for participating clients and donors," and "[t]he fact that it goes into some detail regarding the parties that collect, analyze, and

---

[33] *Id.* at 14.
[34] Rec. Doc. No. 29, p. 13. None of these breaches are listed in the breach section which focuses almost entirely on the d/l isomer issue.
[35] Rec. Doc. No. 35, p. 4.
[36] *Id.*

63105                                                                                                                6

review a donor's sample does not mean that DISA took it upon itself to verify each step. . . ."[37] DISA contends that the MSA between DISA and SWAT did not create a duty to Thibodeaux, noting that the MSA contains a clause explicitly disclaiming third-party beneficiaries.[38]

L. As to breach, DISA argues that: the d/l isomer issue is outdated and irrelevant; Plaintiffs' experts do not argue that the cutoffs were inappropriate; DISA did not train, and had no duty to train, University employees; and Plaintiffs did not plead that the LDTS or federal law applied, and, in any event, neither of them do.[39]

M. As to causation, DISA argues that DISA could not have foreseen that it would cause injury by reporting a positive test result which had been verified by an MRO and Psychemedics.[40] DISA also argues that the ease-of-association prong of causation is not satisfied.[41] According to DISA, its purported duty to ensure the accuracy of test results is not easily associated with Thibodeaux's injuries because DISA played no direct role in testing or verification.[42]

## II. LAW AND ANALYSIS

### A. Rule 56 Motion for Summary Judgment

In reviewing a party's motion for summary judgment, the Court will grant the motion if (1) there is no genuine issue of material fact, and (2) the mover is entitled to judgment as a matter of law.[43] This determination is made "in the light most favorable to the

---

[37] *Id.*
[38] *Id.* at p. 5.
[39] *Id.* at pp. 6–9.
[40] *Id.* at pp. 9–10.
[41] *Id.*
[42] *Id.*
[43] Fed. R. Civ. P. 56(a).

opposing party."[44] The Court cannot engage in weighing the evidence or determining credibility, as those functions belong to a jury rather than the Court; thus, "[the Court] must disregard all evidence favorable to the moving party that the jury is not required to believe."[45] A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case."[46] If the moving party satisfies its burden, "the non-moving party must show that summary judgment is inappropriate by setting 'forth specific facts showing the existence of a genuine issue concerning every essential component of its case.'"[47] However, the non-moving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[48]

Notably, "[a] genuine issue of material fact exists, 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[49] All reasonable factual inferences are drawn in favor of the nonmoving party.[50] However, "[t]he Court has no duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim."[51] "Conclusory allegations unsupported by specific

---

[44] *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); 6 V. MOORE, FEDERAL PRACTICE 56.15(3) (2d ed. 1966)).
[45] *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150–51 (2000).
[46] *Guerin v. Pointe Coupee Parish Nursing Home*, 246 F.Supp.2d 488, 494 (M.D. La. 2003) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).
[47] *Rivera v. Houston Indep. Sch. Dist.,* 349 F.3d 244, 247 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)).
[48] *Willis v. Roche Biomedical Lab., Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little*, 37 F.3d at 1075).
[49] *Pylant v. Hartford Life and Accident Insurance Company*, 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).
[50] *Galindo v. Precision American Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985).
[51] *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

facts . . . will not prevent the award of summary judgment; 'the plaintiffs [can]not rest on his allegations . . . to get to a jury without any "significant probative evidence tending to support the complaint."'"[52]

### B. Negligence Claims

N. The starting point of the analysis is Louisiana Civil Code article 2315: "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."[53] "If the act involves the failure to exercise reasonable care, it is deemed negligence."[54] In order to sustain a negligence claim, the plaintiff must prove the following five elements:

> (1) proof that the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) proof that the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) proof that the defendants' substandard conduct was a cause-in-fact of the Plaintiff's injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the Plaintiff's injuries (the scope of liability or scope of protection element); and (5) proof of actual damages (the damages element).[55]

O. The plaintiff carries the burden of proof, and negligence claims must be proven by a preponderance of the evidence.[56]

---

[52] *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 713 (5th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249).
[53] LA. CIV. CODE art. 2315.
[54] *Meany v. Meany*, 639 So. 2d 229, 233 (La. 1994).
[55] *Long v. State ex rel. Dept. of Transp. and Dev.*, 916 So. 2d 87, 101 (La. 2005); *see also Lemann v. Essen Lane Daquiris, Inc.*, 2005-1095 (La. 3/10/06), 923 So. 2d 627, 632–33.
[56] *Hanks v. Entergy Corp.*, 944 So. 2d 564, 578 (La. 2006).

P. A threshold issue in any negligence action is whether the defendant owed the plaintiff a duty.[57] Whether a duty is owed is a question of law.[58] The question of duty requires the Court to consider the facts and circumstances of the case and decide whether or not a duty should be imposed as a matter of policy.[59] To survive summary judgment at the threshold of a negligence analysis, the plaintiff must point to some legal authority whether it be "statutory, jurisprudential, or arising from general principles of fault to support the claim that the defendant owed them a duty."[60]

Q. Plaintiffs cite several sources to attempt to demonstrate the existence of disputed material facts on the duty issue: (1) the expectations of Thibodeaux's employer,[61] Troy Rembert; (2) the DCCHT;[62] (3) the Louisiana Drug Testing Statute[63]; and (4) Thibodeaux's medical experts' reports.[64] Plaintiffs further argue that policy considerations require finding that DISA had a duty.[65] Plaintiffs also assert and provide authority for the proposition that testing laboratories have a duty "to be responsive for analyzing the relevant samples of Louisiana workers."[66] The Court will consider this claim first.

---

[57] *Lemann*, 923 So. 2d at 633 (citing *Meany*, 639 So. 2d at 233).
[58] *Id.* (citing *Peterson v. Gibraltar Savings and Loan*, 98-1601, p. 7 (La. 5/18/99), So. 2d 1198, 1204).
[59] *Lemann*, 923 So. 2d at 633 (citing *Socorro v. City of New Orleans*, 579 So. 2d 931, 938 (La. 1991)).
[60] *Id.*
[61] Presumably. Plaintiffs only argue that the "the attached affidavit of his employer, Troy Rembert on behalf of SWAT . . . establishes DISA's duty to SWAT and also to Thibodaux [sic], himself." Rec. Doc. No. 29, p. 8.
[62] Rec. Doc. No. 29, pp. 6–8.
[63] La. Rev. Stat. Ann. §§49:1001-1012.
[64] Rec. Doc. 29, p. 5–10. Plaintiffs' medical experts may not provide legal opinions as to duty. The duty section, like most of Plaintiffs' *Opposition*, is bloated with theories yet bereft of controlling law.
[65] Rec. Doc. No. 29, p. 10.
[66] Rec. Doc. No. 29 (citing *Wells v. Disa Glob. Sols. Inc.*, No. 6:17-CV-00014, 2018 WL 3827590, at *1 (W.D. La. June 28, 2018), *report and recommendation adopted*, No. 6:17-CV-00014, 2018 WL 3827264 (W.D. La. Aug. 10, 2018)).

R. The problem with that theory is this: Gulf Coast collected the sample, Psychemedics analyzed it, and University (through Dr. Forman) served as the MRO and prepared the report to send to DISA. In other words, DISA was not the testing laboratory.

S. Louisiana courts recognize that there is no duty to protect against or control the actions of a third-party unless a special relationship gives rise to such a duty.[67] Examples of these relationships are parent-child; employer-employee; carrier-passenger; innkeeper-guest; jailer-prisoner; and teacher-pupil.[68] DISA was not the testing laboratory and Plaintiffs do not argue that DISA had a special relationship with the testing laboratory. DISA had no duty to control the actions of the testing laboratory, so DISA did not take on the duties of the testing laboratory.[69] Plaintiffs' theory of duty based on the duty of laboratories to analyze samples in a scientifically reasonable manner fails as a matter of law.

T. Likewise, Plaintiffs provide neither support for the conclusion that Troy Rembert's affidavit establishes DISA's duty nor citations to specific pages within said affidavit that demonstrate a duty. Plaintiffs' argument seems to be that Rembert's affidavit "establishes" DISA's duty to SWAT—a duty which

---

[67] *Beck v. Schrum*, 41,647 (La. App. 2d Cir. 11/1/06), 942 So. 2d 669, 672 (citing *Mosley v. Temple Baptist Church of Ruston, Louisiana, Inc.*, 40,546 (La. App. 2d Cir.1/25/06), 920 So. 2d 355); *Blacklege v. Font*, 2006-1092 (La. App. 1 Cir. 3/23/07), 960 So. 2d 99, 103; *Corley v. Delaney*, 92–899 (La. App. 3d Cir. 12/15/93), 629 So.2d 1255, 1258, *writs denied*, 94–0481, 94–0636 (La. 4/22/94), 637 So.2d 156; *Wells v. Disa Glob. Sols. Inc.*, No. 6:17-CV-00014, 2018 WL 3827590, at *7 (W.D. La. June 28, 2018), *report and recommendation adopted*, No. 6:17-CV-00014, 2018 WL 3827264 (W.D. La. Aug. 10, 2018).

[68] Beck, 942 So. 2d at 672 (citing *Haskins v. State Farm Fire & Casualty Company*, 612 So. 2d 990, 993 (La. App. 2d Cir. 1993)).

[69] *Wells*, 2018 WL 3827590, at *6–7; *Tilson v. DISA Glob. Sols. Inc., et al.,* No. CV 17-240-SDD-RLB, 2019 WL 6878867, at *5–7 (M.D. La. Dec. 17, 2020).

somehow trickled down to Thibodeaux.[70] Plaintiffs provide *no* authority in support of this argument. For those reasons alone, summary judgment is proper because Plaintiffs have failed "to identify specific evidence in the record, and to articulate the 'precise manner' in which that evidence supported their claim."[71]

U. Moreover, the Court has reviewed the affidavit, and notes that Rembert attested that "SWAT also expects that DISA has a duty to Mr. Thibodeaux. . . ."[72] Two paragraphs prior, Rembert attested: "One of the Terms and Conditions in Addendum A of this Master Services Agreement is that the Agreement is for the sole benefit of DISA and [SWAT], and no third-party shall be deemed a "third-party beneficiary" of this Agreement."[73] In other words, the MSA that DISA and Rembert signed specifically excludes a duty on the part of DISA's with respect to Thibodeaux. In sum, Plaintiffs have offered self-contradicting evidence and no legal authority to back up their theory that the Rembert affidavit shows a duty as to DISA.

Turning to the duty allegedly created by the LDTS, the Court notes a discrepancy between Plaintiffs' *Petition* and *Opposition*. As DISA points out, Plaintiff never pled that the LDTS establishes DISA's duty or that DISA violated it.[74] This allegation goes beyond

---

[70] Rec. Doc. No. 29, p. 8 "First, Thibodeaux has attached the provided affidavit of his employer, Troy Rembert on behalf of SWAT, which establishes DISA's duty to Thibodeaux ad the breach of the duty owed to him."
[71] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994); "The inquiry is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty." *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-1095 (La. 3/10/06), 923 So. 2d 627, 633.
[72] Rec. Doc. No. 29-3, p. 2.
[73] *Id.*
[74] Rec. Doc. No. 35, p. 8

63105  12

the scope of the *Petition*; accordingly, the Court grants the *Motion* as to this theory.[75]

V. Turning to the duty allegedly demonstrated by Plaintiffs' medical experts' reports, Plaintiffs once again do not provide citations to specific parts of the reports or authority supporting this theory.[76] The Court has reviewed the expert reports and finds two portions where Plaintiffs' experts opine as to duty. Dr. Swotinsky opines that DISA owed a duty under the LDTS; the Court has already dismissed that claim.[77] Dr. Swotinsky also opines that "[t]he MRO owed a responsibility to Mr. Thibodeaux."[78]

W. First, Dr. Swotinsky's conclusion that the MRO owed a responsibility to Thibodeaux does not even purport to establish that DISA owed a legal duty to Thibodeaux. Second, the Louisiana Supreme Court has stated that "experts may not rely on their own conclusions as authority in the absence of any objective support."[79] Third, and most importantly, University is not DISA, and

---

[75] *Fields v. Dep't of Pub. Safety*, No. CIV.A. 11-101, 2014 WL 5801460, at *5, n. 2 (M.D. La. Nov. 7, 2014); "[A] party may amend its pleading only with the opposing party's written consent or the court's leave. A party may not amend her complaint by raising new arguments in her brief in opposition to a motion for summary judgment; rather, the party must bring a motion to amend the complaint if she wishes to raise a new claim." See *Anderson v. DSM N.V.*, 589 F.Supp. 2d 528, 535 n. 5 (D.N.J.2008*)*; see also, *e.g.*, *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)"); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend [her] complaint through arguments in [her] brief in opposition to a motion for summary judgment."). The Court also notes that the viability of this argument is dubious. Plaintiffs' argument as to the LDTS is based on the notion that DISA failed to follow the "SAMHSA Mandatory Guidelines" as allegedly required by the LDTS. However, at least one Louisiana appellate court has held that the SAMHSA Mandatory Guidelines do not apply to hair tests. *Russo v. Int'l Drug Detection, L.L.C.*, 18-93 (La. App. 5 Cir. 5/30/18), 250 So. 3d 1100, 1104. Given that the SAMHSA Mandatory Guidelines do not apply to hair tests, DISA's use of a hair test could not possibly violate the Guidelines.
[76] Rec. Doc. No. 29, p. 8.
[77] Rec. Doc. No. 28-24, pp. 5–6.
[78] Rec. Doc. 28-24, p. 10.
[79] *Carrier v. City of Amite*, 2010-0007 (La. 10/19/10), 50 So. 3d 1247, 1250–51.

      Plaintiffs have introduced no evidence that justifies piercing the corporate veil to hold DISA liable for the actions of its subsidiary University.[80]

X. Plaintiffs argue that DISA's control over the drug testing program, as effected through the DCCHT, establishes a duty.[81] Plaintiffs cite this Court's decision in *LeBlanc v. DISA Global Solutions, Inc.*[82] in support of this theory. However, *LeBlanc* is neither analogous nor dispositive. In *LeBlanc*, the plaintiff provided citations to authority establishing a duty to follow one's own stated policies.[83] In the instant case, Plaintiffs argue that DISA's breach was that DISA's policies did not require testing for d/l isomers—not that DISA failed to follow its own policies.[84] Moreover, in the instant case Plaintiffs provide no authority supporting their statement that the DCCHT created DISA's duty to ensure that every positive drug test was not a false positive.[85] Rather, Plaintiffs simply point to the degree of control that DISA, through the DCCHT, exerts over the drug testing process and asks the Court to impose a duty on DISA to be the guarantor of other parties' actions. In the absence of any authority or compelling argument, the Court is disinclined to do so.

---

[80] Generally, a parent has no liability for breaches, acts, or omissions of its subsidiary. *Keaty v. RPM International, Inc.*, 208 So. 3d 507 (La. Ct. App. 2d Cir. 2016); *Bujol v. Entergy Services, Inc.*, 922 So. 2d 1113, 1127–28 (La. 2004); "The involvement of a sole or majority shareholder in a corporation is not sufficient alone to establish a basis for disregarding the corporate entity. Louisiana courts are very hesitant to hold a shareholder, officer or director personally liable for corporate obligations;" *Town of Haynesville, Inc. v. Entergy Corp.*, 42,019 (La. App. 2 Cir. 5/2/07), 956 So. 2d 192, 197, *writ denied*, 2007-1172 (La. 9/21/07), 964 So. 2d 334; *Shoemaker v. Giacalone*, 34, 809 (La. App. 2d Cir. 06/20/01), 793 So. 2d 230, 233 *writ denied*, 2001–2614 (La. 12/14/01), 804 So. 2d 632.
[81] Rec. Doc. No. 29, p. 6.
[82] *LeBlanc v. DISA Glob. Sols., Inc.*, 3:17-cv-00076-SDD-EWD, Rec. Doc. No. 110.
[83] *Id.* at 13; Case 3:17-cv-00076-SDD-EWD, Rec. Doc. No. 91, p. 22.
[84] Rec. Doc. No. 29, pp. 11–13.
[85] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994); "The inquiry is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty." *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-1095 (La. 3/10/06), 923 So. 2d 627, 633.

- Y. Finally, lacking "statutory" or "jurisprudential" "legal authority" that demonstrates DISA's duty to Thibodeaux, Plaintiffs turn to "general principles of fault" and advance a policy based argument.[86] Specifically, Plaintiffs argue that DISA must owe a duty to Thibodeaux because "[o]therwise, an employee is left with no remedy for the harm done to him from a false positive drug test, which results in loss of employment, loss of future employment, and harm to a person's reputation."[87] The Court is not convinced. Plaintiffs could sue University,[88] Gulf Coast, or Psychemedics.

- Z. Even assuming that DISA did have a duty and that DISA breached that duty, Plaintiffs have not proffered evidence that supports a finding that DISA was the cause-in-fact of Thibodeaux's damages. "Cause-in-fact is generally a "but for" inquiry. If [the] plaintiff probably would not have been injured but for the defendant's substandard conduct, such conduct is a cause-in-fact of resulting harm."[89]

- AA.    Plaintiffs' theory as to cause-in-fact boils down to this: If DISA had ordered testing for d/l isomers on Thibodeaux's sample,[90] the d/l isomer test would have shown that the methamphetamine present in Thibodeaux's hair was l-methamphetamine, which is not illegal.[91] The presence of l-methamphetamine, as opposed to d-methamphetamine, would indicate that the positive result was

---

[86] *Id.*
[87] Rec. Doc. No. 29, p. 10.
[88] Where jurisdiction lies.
[89] *Hughes v. Goodreau*, 2001-2107 (La. App. 1 Cir. 12/31/02), 836 So. 2d 649, 662, *writ denied*, 2003-0232 (La. 4/21/03), 841 So. 2d 793.
[90] Or trained the MRO to do so, or required it in the DCCHT.
[91] Rec. Doc. No. 29, pp. 13–14.

a false positive, so DISA would not have changed Thibodeaux's status to "Inactive," which caused his damages.[92] Plaintiffs posit that l-methamphetamine was in Thibodeaux's system because he used over-the-counter and prescription medicines.[93] The viability of this theory turns on one issue: could Thibodeaux's sample have contained l-methamphetamine such that the positive result was a false positive? If Thibodeaux's sample could not have contained l-methamphetamine, then ordering a test for it would have been futile, and DISA would have been correct to submit the positive results.

BB. Plaintiffs have failed to introduce evidence that raises more than a "metaphysical doubt" as to whether Thibodeaux's sample contained l-methamphetamine.[94] Both parties' experts agree that the popular over-the-counter sinus medicine Vick's VapoInhaler contained l-methamphetamine in the past.[95] The parties also agree that the presence of l-methamphetamine in a sample can cause the person being drug tested to test positive for methamphetamine, even though the individual did not ingest the d-methamphetamine.[96]

CC. Plaintiffs' expert Dr. Swotinsky notes that Thibodeaux reported using the prescribed or over-the-counter medications Adderall, Sudafed, Nyquil, Dayquil, and Flonase.[97] He further opines that Vicks VapoInhaler at one point contained

---

[92] *Id.*
[93] *Id.*
[94] *Willis v. Roche Biomedical Lab., Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[95] Rec. Doc. No. 28-23, p. 6; Rec. Doc. No. 28-24, pp. 7–8; Rec. Doc. No. 28-25, p. 6.
[96] Rec. Doc. No. 28-23, p. 6; Rec. Doc. No. 28-24, pp. 7–8; Rec. Doc. No. 28-25, p. 6.
[97] Rec. Doc. No. 28-24, p. 4.

        l-methamphetamine and that "[o]ther similar over-the-counter products currently contain l-methamphetamine and can cause positive drug tests."[98] Plaintiff's expert Dr. Javors adds that "[i]t appear that Vicks inhalers no longer contain l-methamphetamine, much less d-methamphetamine, but it's [sic] presence in other products cannot be dismissed as a possibility."[99] Notably, Plaintiffs' experts do not state that *any* of the drugs Thibodeaux took contain l-methamphetamine. Plaintiffs' experts also do not identify any drugs that *currently* contain l-methamphetamine. In sum, Plaintiffs' experts simply opine that other unnamed drugs, and possibly the ones Thibodeaux took, could contain l-methamphetamine. These conclusory allegations and unsubstantiated assertions do not suffice at the summary judgment stage to create a genuine issue of material fact.

DD.    In contrast, DISA's expert Dr. Selavka stated: "[N]one of Mr. Thibodeaux's self-reported prescribed or OTC medications—including Sudafed, Adderall, Flonase, Androgel and Flexeril—would explain the Positive Methamphetamine identified in his arm hair. These medications do not contain Methamphetamine."[100]

EE.    Plaintiffs have failed to produce summary judgment evidence sufficient to show that had a d/l isomer test been performed, the test would have indicated that Thibodeaux did not ingest illegal methamphetamine. Therefore, Plaintiffs cannot show that the DISA's failure to run or order the MRO to run a d/l isomer

---

[98] *Id.* at p. 7.
[99] Rec. Doc. No. 28-25, p. 7.
[100] Rec. Doc. No. 28-23, p. 4.
63105                                                                                               17

test is the but-for cause of Plaintiffs' damages. As such, Plaintiffs cannot raise a genuine issue of material fact as to the cause-in-fact element of the negligence claim against DISA, so summary judgment shall be granted on Plaintiffs' negligence claims.[101]

FF. Overall, based on the competent summary judgment evidence, the Court finds that DISA did not owe a duty as a matter of law because Plaintiff has failed to identify any disputed factual issues as to duty. Even assuming a duty and a breach, Plaintiff has failed to identify disputed factual issues precluding summary judgment as to cause-in-fact.

**C. Loss of Consortium**

Likewise, summary judgment will be granted on Plaintiffs' loss of consortium claims because the loss of consortium claims are derivative of the primary negligence claims.[102]

---

[101] See *Loiacano v. Disa Glob. Sols., Inc.*, No. CV 14-1750, 2015 WL 7451198, at *4–5 (E.D. La. Nov. 23, 2015), aff'd, 659 F. App'x 772 (5th Cir. 2016); *Loiacano v. DISA Glob. Sols., Inc.*, 659 F. App'x 772, 777 (5th Cir. 2016).

[102] *Fuller v. v. Wal-Mart Stores, L.L.C.*, No. CIV.A. 12-251-RLB, 2013 WL 4094319, at *7 (M.D. La. Aug. 13, 2013) (quoting *Nicholas v. Allstate Ins. Co.*, 765 So.2d 1017, 1031 n. 22 (La.8/31/00) ("Having found that Nicholas is not entitled to recovery, we further find that Neva Nicholas's claim for loss of consortium also falls because her claim is derivative of her husband's.")).

### III. CONCLUSION

For the reasons set forth above, DISA's *Motion for Summary Judgment*[103] is **GRANTED**. Plaintiffs' claims against DISA Global Solutions, Inc. are hereby dismissed with prejudice. *Judgment* shall be entered accordingly.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana, on November 3, 2020.

*Shelly D. Dick*

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[103] Rec. Doc. No. 28-1.